50 So.2d 469 (1951)
BUFORD
v.
COMBS et al.
No. 3343.
Court of Appeal of Louisiana, First Circuit.
February 8, 1951.
*470 Thos. F. Porter, Thos. L. Raggio, Lake Charles, for appellant.
Fred C. Selby, Griffin T. Hawkins, Lake Charles, for appellees.
ELLIS, Judge.
On Sunday morning, February 4th, 1945 around 6:30 A.M. a large truck with a single action pole trailer, loaded with a silver colored tank approximately 56 feet long and extending over the rear end of the trailer some six feet with an over-all weight of approximately 30,000 pounds, belonging to C. L. Bell of Houston, Texas, operating under the trade name of the Combs Truck Lines, was proceeding north on highway 171 between Lake Charles and Hollingsworth, and when about five miles south of the latter town the right rear dual wheels of the trailer came off of the axle, and the right end of the axle fell down on the pavement. Various attempts were made during the day to repair the trailer which were unsuccessful, and as a result, this truck-trailer remained on the highway until sometime Monday afternoon, February 5th.
Around 7:00 A.M. on Monday, February 5th, before daybreak, Sidney Paul Buford, accompanied by a guest passenger, Miss Emma Jean Bertrand, was driving north on Highway 171 and ran into the rear of the truck-trailer, resulting in his death and painful injuries to the passenger.
On January 31, 1946 suit was filed by Mrs. Sidney Paul Buford, widow of the deceased, individually and on behalf of her minor son, for damages, and by Miss Jean Bertrand for damages, alleged to have been sustained by her as the result of the same automobile accident. These two suits were consolidated for the purpose of trial. These suits were filed against R. C. Combs, alleged to be operating under the trade name of the Combs Truck Lines, and the Commercial Standard Insurance Company. The defendants filed an exception of no cause or right of action and plea of prescription of one year, which were referred to the merits, and answered denying all material allegations of plaintiff's petition, and, in the alternative, pleaded contributory negligence on the part of the deceased and his guest passenger.
The Lower Court with written reasons overruled the exceptions and the plea of prescription and rendered judgment in favor of Mrs. Sidney Paul Buford, individually, for expenses amounting to $974.55 occasioned by the death of her husband, and $5,000.00 for loss of support and maintenance, and $2,500.00 for the loss of her husband's society, or a total of $8,474.60, and further rendered judgment against the insurer in her favor as natural tutrix of her minor child in the sum of $3,500.00 for loss of support and maintenance and $2,500.00 for the loss of the society, influence and love and protection, or a total of $6,000.00.
Judgment was rendered against the insurer in favor of the plaintiff, Miss Emma Jean Bertrand, for expenses incurred and loss of salary amounting to $1,906.80, and in addition the sum of $3,000.00 for injuries sustained and pain and suffering therefrom, or a total of $4,906.80.
By way of explanation, after the filing of the suits it was learned that R. C. Combs had, prior to the accident, sold his truck line to C. L. Bell, however, it was still operating under the trade name of Combs Truck Lines, and although a motion to substitute Bell as party defendant had been made, service was not made upon Bell, and the insurance company remained the only defendant insofar as these trials are concerned.
From these judgments the defendant insurance company has appealed and the plaintiffs have answered the appeal asking for an increase in the awards.
The defendant is only re-urging its plea of prescription of one year. The defendant contends that as the Combs Truck Lines was owned by C. L. Bell prior to and on the date of the accident, and the policy of insurance in effect on said date did not insure R. C. Combs, d/b/a Combs Truck Lines, and that plaintiffs on October 29, 1946 filed an amended petition asking that the name of C. L. Bell be substituted for R. C. Combs, it therefore submits that the suit against R. C. Combs, d/b/a Combs *471 Truck Lines, and against the defendant as the insurer of R. C. Combs, d/b/a Combs Truck Lines, was an entirely separate cause of action, and as no suit was filed against C. L. Bell, d/b/a Combs Truck Lines, and the defendant insurance company as the insurer of the latter truck lines within the one year prescriptive period, the cause of action had prescribed. The facts surrounding the plea of prescription as shown by the record are that prior to the sale of the Combs Truck Lines to Bell, the truck had painted on them "Combs Truck Lines, Houston, Texas," and subsequent to the purchase no change was made in this respect. Furthermore, the manager of the company prior to the sale continued as the manager of the company subsequent to the sale and was so employed by Bell on the date of the accident. Both the manager and Bell personally came over to the scene of the accident on the afternoon of the day that it occurred.
On April 5, 1945 the attorney for both plaintiffs addressed a letter to the Combs Truck Lines, 2034 Maxwell Lane, Houston, Texas, advising them that he represented plaintiffs and requesting their position in the matter. On April 24, 1945, L. M. Price, General Manager, answered this letter and stated therein: "Kindly be advised that our insurance carrier is the Commercial Standard Insurance Company, Shell Building, Houston, Texas, and you may refer any claims to them. Very truly yoursCombs Truck Lines, L. M. Price, General Manager," with the notation of a copy to Commercial Standard Insurance Company, defendant herein.
We agree with the trial judge that plaintiffs were authorized by law to proceed solely against the insurer in claims of this nature, and, secondly, it is the law that Bell could have been substituted in the suit as one of the defendants in the place and stead of R. C. Combs, under the facts, for prescription was interrupted as Bell had actual knowledge of the collision, and correspondence and negotiations had been carried on with his manager, Price, and it was through his office that plaintiffs learned that the defendant was the insurer, and he also had notice of the filing of the suit prior to the running of prescription. See Lunkin v. Triangle Farms, Inc., 208 La. 538, 23 So.2d 209; Nelken v. Harrison, La.App., 31 So.2d 25; Jackson v. American Employer's Insurance Co., 202 La. 23, 11 So.2d 225; Norwich Union Indemnity Company v. Judlin & Whitmire, 7 La.App. 379; Gueble v. Town of Lafayette, 118 La. 494, 43 So. 63; Commercial Fire & Casualty Co. v. T. W. Kleinpeter Construction Co., La.App., 47 So.2d 387.

Merits
The highway at the scene of the accident runs north and south and is straight and level for a distance of several miles in either direction from the place where the collision occurred. The highway is paved with a concrete slab about 18 feet in width, and on each side of such slab the shoulder of the road was at least ten or twelve feet wide. The shoulder on either side of the road, therefore, was wide enough to enable a large vehicle to be parked easily on such shoulder without any part of the vehicle remaining on the concrete slab.
The weather was very bad at the time of the accident. It was cold, the wind was blowing hard, and a misty rain with occasional heavy rains fell almost continually during the night immediately preceding the time of such accident. The collision occurred shortly before or after 7:00 o'clock in the morning and at that time it was dark and a heavy rain was falling. Visibility, therefore, was very poor.
The truck was painted red with black fenders but the tank was freshly painted a silver or aluminum color. The rear end of the trailer was equipped with dual wheels so that there were a total of four separate wheels and tires in the rear of the trailer, all attached to or operating on the same axle. The tank on the trailer was about four or four and one half feet above the ground and was fastened to the trailer by means of metal straps or chains.
It is shown that the driver of the truck tried to pull it off the pavement but was unable to do so because the ground was wet and the wheels of the truck would spin.
*472 The front end of the combination truck and trailer was partially on the pavement and partially on the east shoulder of the highway, and the rear end of the trailer was about in the center of the right or east lane of traffic on the paved portion of the highway. This was the position of the truck from the time it finally stopped until the accident occurred, some twenty-four hours later.
As stated by the trial judge, "there is a dispute as to whether the driver and owner of the truck made sufficient effort to get the truck and trailer off the paved portion of the highway between the time the vehicle became disabled and the time of the accident, and as to whether the right rear wheels were on the trailer at the time the collision occurred. The principal issue of fact, however, is whether the owner or driver of the truck had placed and was maintaining proper flares or other warning devices around the truck just prior to and at the time of the accident in order to warn approaching motorists of the danger. * * *"
In view of the conclusion we have reached, it will only be necessary to discuss the last mentioned issue as to whether the flares were burning just prior to and at the time of the accident.
The driver of the car in which the plaintiff, Emma Jean Bertrand, was a guest at the time of the accident, died without making any statement or regaining consciousness as far as the record shows. We, therefore, have only the two witnesses, the plaintiff, Emma Jean Bertrand, and the driver of the truck, who were actually at the scene at the time of the collision. Miss Bertrand testified that she was watching the road ahead immediately before and at the time of the accident and that there were no flares or lights anywhere on the highway in the vicinity of the truck or on the truck itself. She did not know exactly how far the car in which she was riding was from the truck when "all of a sudden we saw this white thing in front of us and that is all I remember," but "we must have been very close." On the other hand, the driver of the parked truck testified that three kerosene flares and three electric flares had been stationed along the highway on Sunday afternoon, February 4th, and that all of the flares were lighted and continued to burn the entire night and were actually burning at the time the collision occurred. He stated that two flares were placed in front of the truck, two on the side and two to the rear, and in addition to the flares that all of the clearance lights and tail lights, making fourteen in all, were kept burning during the entire night and were burning at the time of the accident.
Witnesses were produced who had passed this parked truck from late afternoon on Sunday and through Sunday night and early Monday morning shortly prior to and subsequent to the accident, and it is upon the testimony of these witnesses, as well as physical facts, that the case must be decided.
There is no doubt but that the flares were properly placed at approximately four or five o'clock on Sunday afternoon, and burning during the early part of Sunday night until approximately nine or ten o'clock. We have the testimony of a witness who passed this truck about nine o'clock on Sunday night and at that time there were no lighted flares or lights of any kind on or around the truck, and he was unable to see this truck until he reached a point within 40 or 50 feet of it, and another witness who passed the truck at approximately 10:30 P.M. Sunday night and who testified that there were no flares, lights or warning signals of any kind on or around the truck and that he was not able to see the truck until within 75 feet of it and only then because it was illuminated by a flash of lightening. There were also two other witnesses riding together in a car who passed this truck, they estimated around 7:00 A.M. or shortly thereafter Monday morning, which would be very close to the time or just before the accident occurred, and they saw no lights on the truck or flares around it and commented to each other at the time on the fact.
In addition, we have the testimony of W. T. Koonce who was operating a gasoline truck traveling north on Highway 171 north of Lake Charles on his way to DeQuincy, and who passed this truck between 5:30 and 6:30 A.M. on February 5th, and *473 he testified that there were no lighted flares or lights of any kind on or around the truck, although he observed at that time flares on the highway near the truck but they were not lighted, and he was unable to see this truck until he was "right on it." He stopped behind the parked truck to let another truck which was meeting him pass, and while he was stopped he saw the unlighted flares sitting in the road. He testified that as he pulled around and passed the parked truck he saw the driver in the cab of the truck but could not say whether he was asleep or awake. This witness went on to his destination, and when he returned the accident had occurred. At that time there were lighted flares around the truck, although it was daylight. Koonce picked up the driver of the parked truck and took him to Lake Charles, and while on the way Koonce told Gupton, the driver, that he had passed the truck earlier that morning, and in testifying to a conversation he had with the driver of the truck he stated:
"A. I didn't ask him too many questions about it. I told him when I went up there that morning I didn't see any flares burning. First, I asked him what happened and he told me what happened. I said, `Well, I'll tell you, Bud, they were not burning this morning when I went up to DeQuincy.' He said `I filled them up with gasoline and they are burning now.' And I could see that they were.
"Q. Even in the daytime? A. Yes, sir.
"Q. He later made them burn? A. He said he had to put some gasoline in them to make them burn. It burned out of kerosene. I learned that when I came back."
The driver of this truck did not positively state whether he had re-lit the flares before or after the accident and Koonce did not pursue the subject any further, however, this statement is not consistent with his testimony that these flares were burning continuously during the entire night and at the time of the accident, and that fourteen clearance lights were burning on the truck and trailer.
The defendant, in addition to the testimony of the truck driver, is depending upon the testimony of D. C. Fusilier, driver of a 7-Up truck, who was the first to reach the scene after the occurrence of the accident, and the witness, E. H. Paul, who was the third person to arrive, the second being a colored driver for Swift and Company who did not testify; and Marshall Thompson and his son, George Marshall Thompson, and A. Jackson, a school bus driver. Their testimony will be discussed somewhat in detail in an effort to coordinate their versions with that of the plaintiff's witnesses, as we really do not think they are in conflict.
Fusilier was driving in a northerly direction and thus approaching the parked truck from the rear when a vehicle, which was meeting him and which he later testified was a truck and trailer, suddenly swerved into his lane of traffic and the driver blew his horn loudly and called out a warning to Fusilier that there was a wreck ahead. He did not know the driver and there is no testimony as to whether this driver, in using the word "wreck" was referring to the parked truck, or whether he meant that the collision had occurred. The driver of the parked truck makes no mention in his testimony, which was taken by deposition, to this truck passing immediately preceding the time Fusilier arrived at the scene of the collision. It is strange that if the driver who gave the warning to Fusilier knew there had been such a collision that he did not immediately stop. It leads us to think that Fusilier was somewhat mistaken in the distance that he met this truck from the parked truck, and that the driver who warned him was referring to the parked truck and no collision had occurred at the time he passed the parked truck. It is also strange that if the collision had already occurred that the truck driver did not flag down the driver of this truck to get assistance in releasing the deceased and Miss Bertrand from the automobile in which they were trapped. After Fusilier had received the warning and had driven a very short distance ahead, he stated his headlights "picked up the wreck."
The District Judge further detailed his testimony as follows: "* * * On direct *474 examination this witness testified that he saw two lights burning as he approached the wrecked vehicles, both of which `turned out to be flares burning before the back of the truck.' On cross-examination, however, he testified that one of the lights he saw `could have been the tail light of the Buford car,' and in a written statement made by him shortly after the accident he said, `I do not think the lights that I saw were flares * * *.' He also testified that he ran over a lighted electric flare as he approached the wrecked vehicles, although he saw this flare from 100 to 150 yards before he got to it, and that after he stopped within twenty-five feet of the wrecked Buford car the only light he could find burning was the electric flare which he had run over and which then was under his own truck. In walking around the truck, however, he later saw another flare burning on the left side of the disabled truck. He further testified that when he got out of his truck he found the cab lights of the Combs truck to be on but that such lights were visible only from the front and there were no clearance lights, tail lights or any other lights on the truck which were burning and were visible from the rear. Fusilier, moreover, testified that the truck driver, Gupton, relighted and replaced the flares which had been knocked over between the time Fusilier arrived at the scene of the accident and before Mr. E. H. Paul arrived."
This witness' testimony is difficult to follow and is full of inconsistencies, and we do not place much value upon it except that it establishes one fact, as does the testimony of every other witness for the defendant except that of the driver of the Combs truck, that the lights had been rearranged as well as relighted by someone between the time that the driver put them out and the time that Fusilier arrived at the scene. It is definitely proven that these lights were not burning from approximately nine or ten o'clock P.M. on Sunday until around 7:00 A.M. Monday.
It will be remembered that the driver testified he had placed two lights in front, two on the side and two behind the truck. If we take the testimony of Fusilier at its best, he saw two lights behind the truck and one on the side of the truck. The clearance lights on top of the cab which are only visible from the front of the truck were on, but no other clearance lights on the truck or trailer were on. He also testified that someone had rearranged these lights and it could only be the driver, and the question is, when did he do it. He contends that they were on all the time. This is impossible under the preponderance of the testimony. It will also be noted that Fusilier makes reference to lights that were knocked over and not burning. It is not shown who knocked these lights over, but the implication is that they were Knocked over by the Buford automobile. It is difficult for us to believe that Buford, driving at 35 miles an hour, would not have seen two burning flares, one being approximately 100 feet in the rear of the truck, or that, if he did run over them while they were burning, more than likely there would have been some skid marks where he applied his brakes. We believe that these flares were unlighted and that is the reason that Buford failed to see them.
The witness Paul arrived at the scene of the accident shortly after it occurred, about day-light, and the only other vehicle there besides the wrecked ones were the Swift and Co. truck and a colored driver, who, as stated, did not testify in the case, and a 7-Up truck which was unquestionably the one being driven by Fusilier. Miss Bertrand had been removed from the wrecked car prior to his arrival but he assisted in the removal of the decedent. This witness testified that there were some flares burning when he arrived at the scene of the accident. He saw one burning even with the back of the trailer and the other farther back, and one electric flare back behind the truck to the right in the ditch. From this testimony we take it that there had been three flares behind the truck. This witness further testified that when he was walking up to the truck from the rear after the collision he tripped over a reflector in the middle of the road not burning.
*475 The next persons to arrive at the scene were Marshall Thompson and his son, George, who was in the Navy. It is their testimony that they arrived about 7:30 A.M. and at that time they observed two lighted flares, one of which was located in front of the truck and one to the rear of it.
Jackson, the school bus driver, testified that he passed the parked truck going south about 7:15 or 7:30 A.M. on the morning of February 5th and passed it again going in the opposite direction about twenty or twenty-five minutes later. He did not observe that there had been a wreck the first time he passed the truck, but he did observe and see two kerosene flares in front of the truck, and to the rear or south of the truck he saw three flares, two kerosene and one electric, and that the electric flare was in the middle, and he saw no flares on the side. When he returned close to 8:00 o'clock A.M. it was full daylight and he observed the same flares but, in addition, a little girl on the bus called his attention to one of the electric flares that had been run over. This was evidently the missing sixth flare. We are of the same opinion as the District Judge that when this witness went south with his school bus in order to pick up the children, the wreck had already happened. There is no doubt that there were six flares put out on the previous afternoon, and it is practically conceded, or at least it is logical to presume, that the light which was missing at the time Jackson first passed the truck and which was discovered by the little girl in the bus as having been run over the second time they passed was run over by the Buford car just prior to its collision with the truck. If this be true, then the accident had already occurred when Jackson first passed going south, and he himself concedes that if it had happened he didn't see it. In fact, he saw no one when he first went south, and he could not state whether it had happened before he first passed the truck or not. In response to the following question, he gave the following answer:
"Q. Would you have seen the car underneath the back end of the trailer if he had been there when you came down when you first passed? A. Well, I would think so, but I wouldn't swear I could because it was kind of drizzling rain and I could have overlooked it. It looks like if it had been there, I would have seen it."
It is not hard to understand why he would not have seen the wrecked automobile as the entire front end was up under the rear end of the trailer and tank, and the tank is what broke the top and bent it down, and he was coming from the north, traveling south, and possibly did not look other than to notice the flares and see that he passed safely. The defendant contends that if the collision had happened at the time Jackson first passed going south with his school bus that he would have seen the wreck, the 7-Up truck, or some activity by Gupton or Fusilier. The only answer is that it is entirely possible that it had happened and that he did not see the Buford car, and that he passed before Fusilier or the 7-Up truck arrived but after Gupton had rearranged and re-lighted the unlighted flares. No one else but the driver of the disabled truck rearranged these flares and re-lighted them because the positive testimony is that they were out during the night and just prior to the accident. It is our opinion that the driver of this truck, when the accident occurred, was in the cab, more than likely asleep, and upon being awakened by the collision, rushed out and the first thing he did was to remove the lights from the side of the truck and replace the one that had been knocked over to the rear of the truck with the two side lights. We can reach no other conclusion but that the lights were out immediately preceding the collision and that the lights had been rearranged, and above all, that when Jackson first passed, one of the lights was missing. This light had been knocked over by the Buford car.
If it is not logical to presume that the collision had occurred prior to the time that Jackson first passed, then his testimony is in irreconcilable conflict with the testimony of the witnesses who passed just prior to the accident and testified that there were no lights or flares burning. The Combs truck driver has not told the entire truth, because it is absolutely an inescapable *476 fact that someone rearranged and relighted these flares between the time that Cobband Theriot passed and the time that Jackson first passed the truck. It would be absurd to assume that anyone other than the driver did this, and the reason that he did not straight-forwardly testify that the flares were out and that he re-lighted them was due to the fact that he did this after the wreck.
The state troopers' testimony is in the record, however, it is not important as they arrived after eight o'clock and found flares burning around the wrecked vehicle.
We agree with the conclusion of the lower court that the flares went out or discontinued burning sometime between nine and ten o'clock Sunday night, and that immediately prior to and at the time of the accident there were no lighted flares stationed near the disabled truck, and at such time no clearance lights, tail lights or any other lights were burning on the truck which were visible from the rear. The Combs truck driver, Gupton, was, therefore, negligent in failing to maintain the lighted flares or other warning device, and, of course, his negligence is imputed to the owner of the truck, and the defendant insurance company is, therefore, responsible in damages unless plaintiffs are barred from recovery by contributory negligence.
Insofar as the plea of contributory negligence is concerned, we hereby adopt the opinion of the District Judge which is as follows:
"The general rule is well established in this State to the effect that it is the duty of the operator of an automobile, while driving at night, to operate said automobile in such a manner that it can be stopped within the range of vision illuminated by the headlights of the car. It is also well settled that there may be exceptional circumstances which will serve to exculpate a driver who, because of those exceptional circumstances and in spite of due diligence, fails to discover some obstruction or some other vehicle on the road ahead of him, and that no fixed rule may be laid down by which it may be determined just what will constitute such exceptional circumstances. Woodall v. Southern Scrap Material Company, La.App., 40 So.2d 495; Hemel v. United States Fidelity & Guaranty Co., La.App., 31 So.2d 38; Gaiennie v. Cooperative Produce Co., Inc., 196 La. 417, 199 So. 377; Louisiana Power & Light Co. v. Saia, 188 La. 358, 177 So. 238; Dodge v. Bituminous Casualty Corporation, 214 La. 1031, 39 So.2d 720; Rea v. Dow Motor Company, La.App., 36 So.2d 750."
"The facts in the cases of Gaiennie v. Cooperative Produce Company and Dodge v. Bituminous Casualty Corporation, supra, both of which were decided by the Supreme Court, are similar to the facts in the case now being considered. In the Gaiennie case [196 La. 417, 199 So. 378] the vision of the plaintiff was `momentarily and intermittently impaired' by the lights of approaching cars, and in meeting these cars he dimmed or deflected his lights so that the tilted beam of his headlights projected under the body of the parked truck, making it more difficult for him to see the truck. The body of the truck was suspended some three or four feet above the ground and extended back about four feet over the rear wheels. The Court held in that case that because of the exceptional circumstances, the general rule did not apply and that plaintiff was not contributorily negligent in running into the rear of the parked truck."
"In the Dodge case plaintiff's vision was impaired by approaching vehicles, but there is nothing in the opinion of the Court to indicate that plaintiff dimmed or deflected his headlights. And there is no mention in the opinion as to the distance the body of the truck was suspended above the ground, the distance it extended behind the rear wheels, or the color or design of the body of the parked vehicle. The evidence simply showed that plaintiff's visibility was affected by the lights of oncoming traffic, and because his visibility was so affected, he did not see the unlighted truck parked at an angle on the highway until he was right on it. Under those circumstances the Supreme Court held that plaintiff was not contributorily negligent in colliding with the parked vehicle."
*477 "In the present case there is nothing in the record to indicate that decedent was blinded by the lights of an oncoming vehicle or that he dimmed or deflected his lights. The evidence does show, however, that immediately before and at the time of the accident decedent's vision was impaired by a very heavy rain, and because his vision was so impaired, he did not drive over thirty-five miles per hour at any time that morning and was driving at a speed of only thirty miles per hour immediately before the collision occurred. This Court considers such a speed to be reasonable and ordinarily should have enabled the driver to bring his vehicle to a stop before colliding with a stationary object in the highway. The evidence further shows, however, that the tank on the rear of the Combs truck was supended about four or four and one-half feet above the surface of the road, or about as high as a man's shoulder, and that the tank extended some six feet over and behind the rear wheels of the trailer. Messrs. Koonce, Newman and Gimnick experienced some difficulty in seeing the parked truck at night, and this Court is convinced that the tank of the parked truck was above and outside the field of vision ordinarily illuminated by the headlights of an automobile, particularly during a heavy rain, even though such lights may not be dimmed or deflected. The tank on the Combs truck was painted a silver color, which ordinarily should reflect light. It appears to this Court, however, that the reflection from such a color would not be effective in serving as a warning to motorists approaching during a heavy rain, since there is probably a greater reflection from the raindrops themselves. It appears to this Court that at the time of the accident the decedent was operating his automobile in a careful and prudent manner, and that his failure to observe the unlighted parked truck sooner than he did was not due to any act of negligence on his part, but, on the contrary, was due principally to the condition of the weather and to the fact that the tank on the truck was suspended a considerable distance above the road."
"This Court concludes that because of the exceptional circumstances existing in this case, the decedent cannot be held to have been contributorily negligent simply because he collided with a stationary object on the highway. This Court can find nothing further in the actions of the decedent which would constitute negligence on his part, and therefore finds that he is free from contributory negligence."
The deceased was sixty years of age and was earning $250.00 per month. In view of these facts, and taking into consideration the value of the dollar, we have decided to increase the award to the plaintiff individually for loss of support and maintenance and the society and affection of her husband to the sum of $10,000.00. In addition, plaintiff is individually entitled to the sum of $974.65 for expenses incurred by her as the result of the accident as awarded by the District Court.
The Lower Court rendered judgment in favor of the plaintiff on behalf of her minor son who was fourteen years of age at the date of his father's death in the sum of $6,000.00. We hereby increase this amount to the sum of $7,500.00.
It is therefore ordered that the judgment of the District Court as amended be affirmed.