LOTTINGER, Judge.
Petitioner, Mrs. Martha Hicks, is the widow of the late Joseph H. Hicks, who was killed in an automobile accident. She sues for damages for his death, and is joined as party plaintiff by Traders & General Insurance Company who seeks damages in the amount paid under a collision policy on the Hicks vehicle. The defendants are Raymond Tilquit, the operator of the truck involved in the accident, and Maryland Casualty Company, the public liability insurer of the truck. The Lower Court gave judgment for petitioners, and the defendants have appealed.
The facts show that the afternoon and night of January 30, 1954, was a rainy one. Between rains there was a constant drizzle most of the afternoon and night. Official sunset that evening was 5:40 p. m.
At sometime between 3:00 and 4:30 p. m., on the afternoon of January 30, 1954, a Louisiana State Penitentiary truck and trailer was proceeding northerly on Highland Road which traverses the campus of Louisiana State University. The driver of the truck was defendant Tilquit, a trustee at the said penitentiary. Mr. Ducote, a penitentiary guard, was seated beside Tilquit in the truck. As the truck proceeded along the highway he brought *101 his truck to á stop in front of the Pan American House on the campus to check his right rear dual tires. One of the tires was flat, and the' other was in the .process of going flat.
Highland Road, at the scene of the accident, is a blacktop highway of 24 feet in width. There are “no parking” signs in the area, and • there are no street lights. The record shows that traffic was heavy as there was a basketball game to be played in the L. S. U. Coliseum that night. The Coliseum is situated some three or four hundred feet south of where the truck stopped.
Within a few minutes from the time that the truck stopped another truck from Angola came to the scene and took Tilquit to a repair service station. In the meantime, Tilquit had removed the dual wheels from the right side of the truck. The truck was left in the same position in which it had been originally parked, with the right rear of the trailer jacked up and the dual wheels removed.
The testimony shows that the truck was parked parallel to the curb, with its right side anywhere from eleven inches to four feet from the curb. The photographs introduced into evidence indicate that the right side of the truck was about two feet from the curb.
The truck remained in this position until the , accident occurred at approximately 6:45 p. m. Therefore, the truck remained in this position for a period of some three hours before the accident.
Richard P. Ducote, the penitentiary guard, remained with the truck. At one time he did leave the truck for a period of some half hour, at which time he went to determine what was the delay in repairing the tires.
The trailer was a stake body trailer painted red. The trailer was thirty-three feet seven inches in length, seven feet and nine inches wide, and the bed of the trailer was about four feet from the ground. The rear end of the trailer protruded some five feet to the rear of the rear wheels. The truck and trailer combination was some forty feet in length. The trailer was loaded with hay.
At 6:45 p. m. the deceased, Joseph H. Hicks, was driving his automobile in a northerly direction on Highland Road. With him was Mr. William E. Roucher, who was riding on the front seat to the right of the driver. Deceased ran into the rear end of the trailer causing his immediate death and seriously injuring his passenger. His widow seeks damages in the amount' of $71,400, and his collision insurer seeks damages in the sum of $1,145. The Lower Court awarded damages to Mrs. Hicks in the sum of $10,000 plus legal interest from date of judicial demand, and damages of $1,090, plus interest, was awarded the insurance company. The defendants have appealed. Petitioners seek affirmance of the judgment below.
Several witnesses, although not eyewitnesses to the accident, testified as to the scene of the accident a short time prior to the collision. Mr. P. J. Materiste passed the scene of the accident at about 6:15 p. m., just about thirty minutes prior to the collision. He was proceeding in a northerly direction, the same direction in which the truck and the Hicks auto were headed. He testified that he saw no flares or signal lights on or near the truck although it was already dark. He stated that he almost ran into the truck, that it loomed up in front of him as a dark object. He first noticed the truck as a shadow from the lights of the cars approaching him. He said that he stopped to allow approaching traffic to pass, that there was no room for traffic going both directions to pass around the truck.
Mr. C. L. Daigle, who passed the scene of the accident at about 6:30 p. m., stated that there was one blinker light burning on the rear of the truck. No other lights were burning, nor did he see any reflectors. He testified that he stopped to tell the driver of the truck that it was a “death trap” but was unable to find any occupant of the truck.
*102 Richard Ducote, who was left in charge of the parked truck, testified that he put out reflectors shortly before dark. He stated that he placed one 10 to 15 feet in front of the truck, one 10 to 15 feet to the rear of the truck and another 25 to 30 feet to the rear of the truck. After the accident one of the rear reflectors was found crushed near the curb at a distance of about 25 feet to the rear of the truck. Another was found about at the rear end of the Hicks automobile turned over on its side. No evidence in the record shows just when the first reflector was crushed, or when the second was turned over.
The Lower Court stated as follows:
“The facts stated appear to fall far short of showing that proper precautions had been taken and maintained as required by law for the protection of oncoming traffic from the hazards of the parked vehicle. It was the testimony of the officer Nettles that he considered the situation a ‘horrible hazard.’ He and his fellow officer, Baxley, were the only eyewitnesses to the collision. They came to the scene for the avowed purpose of parking their patrol car to the rear of the parked vehicle, pointing in the opposite direction with its headlights and spot light on in order to properly warn oncoming traffic. Unfortunately they arrived seconds too late.”
We feel that the evidence clearly establishes that the defendants were guilty of negligence. None of the witnesses who preceded the accident saw any flares or reflectors displayed as is required by State law and the ordinances of the City of Baton Rouge. Two of these witnesses testified that the situation was a “death trap” as it proved to be. Officer Nettles described the situation as a “horrible hazard.” The only party who testified as to any rear lights on the truck, other than Ducote himself, was witness Daigle who testified that the blinker light signalling a 'left turn was on. Daigle himself described the situation as a “death trap.”
We are convinced from this record that there were no reflectors standing behind this truck at the time of the accident. Mr. Ducote, who was left in charge of the parked truck, made no attempt to maintain the reflectors in their proper positions nor did he attempt to direct traffic around the truck or attempt to avert the inevitable. We are therefore of the opinion that the requirements of R.S. 32:441, requiring the operators of motor trucks parking on the highways between one-half hour after sunset and one-half hour before sunrise to place a portable flare, reflector, or similar device (which may be plainly visible for a distance of 500 feet) approximately 100 feet to the front and another 100 feet to the rear of his vehicle, and shall maintain these devices in this position during the time the vehicle remains parked, were violated and is a proximate cause of the accident.
As to the question of contributory negligence on the part of the deceased, the Lower Court said:
“The case was laid over from oral argument for further consideration of defendant’s plea of contributory negligence and for the purpose of determining whether or not the evidence shows any unusual conditions and exceptional circumstances which go to form exceptions to the general rule that a motorist will be held to have seen an object, which, by the use of ordinary care and prudence, he should have seen in time to avoid running into it, and the driver of an automobile is guilty of negligence in driving at a rate of speed greater than that in which he can stop within the range of his vision. The decisions are so numerous and the jurisprudence is so well settled that it seems unnecessary to cite authority for this general rule or on the question of the duties imposed by law on the operator of a parked vehicle.
“The driver of the moving vehicle involved in this case was killed in *103 stantly in the collision. His guest passenger was' seriously injured and testified that he had no recollection of the facts surrounding the collision or for a considerable period of time prior thereto. The two police officers were the only eyewitnesses of the collision who gave testimony on the trial of the case. From the somewhat meager and uncertain testimony of these officers, pieced together with the physical evidence, the court is obliged to determine whether the operator of the moving vehicle was guilty of contributory negligence which was the proximate cause of the collision, or. whether the facts bring the case within the exceptions to the general rule setting forth the duties and responsibilities of the operator of the moving vehicle.
“Some of the pertinent facts have already been discussed in connection with the findings of negligence on the part of the operators of the parked 'vehicle.
“Considering all the evidence, it is my opinion it fails to show that the Hicks car was traveling in excess of 25 miles per hour, the legal maximum at that point. Defendant contends that the extent of damage to the car as evidenced by the photographs and the testimony shows otherwise. However, it must be remembered that the bed of the trailer was approximately 4j/á feet above the pavement; that it extended 5 or 6 feet to the rear of the rear wheels; and that the right rear dual wheel had been removed, with a jack supporting that portion of the loaded trailer. A speed of 25 miles per hour, or less, was sufficient for the car to be projected underneath the trailer until the left front of the car came into contact with the left rear wheels of the trailer and the windshield of the car came into contact with the rear end of the trailer. Whether the damages to those portions of the car indicate a greater speed than 25 miles per hour, I am unable to say. When the car. knocked, the jack from under the right rear of the trailer the photographs -show that portion of the loaded trailer dropped spmewhat, doubtless damaging the car in addition to the damage caused by the impact.
“The evidence shows that as the Hicks car approached the parked trailer the police car and at least one other car traveling about .,.40 feet ahead of the police car approached the trailer from the opposite direction. The testimony of the police officers was that the police car was traveling with dimmed lights. It is my opinion from the evidence that the Hicks car and the car immediately in front of the police car were likewise traveling with dimmed lights. Hicks was facing the light of the two oncoming cars as he approached the parked trailer. If these lights were dimmed they did not shine directly into his eyes but they were clearly within his vision, however, they did not illuminate the body of the trailer to any extent whatever.
“The evidence shows that rain had been falling intermittently for several' hours prior to the collision, although it appears that no rain was falling a't the precise moment of the collision. However, the pavement was wet, and it is a matter of common knowledge that wet pavement causes queer tricks with lights. This may account for Hicks’ failure to observe and recognize any reflectors if any . were in position, which is not certain, and it may account for his failure to ob-. serve and recognize any tail lights or blinker lights on the trailer if any were in operation, which is not certain. The wet pavement would likewise account for the absence of any skid marks which might have been made by the Hicks car. There is no positive evidence that he ever applied his brakes, although the officer Nettles testified that just prior to the *104 collision' the front of the Hicks car appeared to bow down as if the brakes had been applied.
“However, in my opinion the most exceptional features of this case are the facts relating to the physical structure of the trailer. As has already been noted, the bed of the trailer was approximately 4[4 feet above the pavement and the bed extended back some S or 6 feet to the rear of the rear wheels. The right rear dual wheel had been removed and the trailer was there supported by a slender jack. In my opinion the ■dimmed lights of the Hicks car could not and did not pick up any part of the parked trailer until he was very near upon it; that he then saw the trailer for the first time, and at the first time it was possible for him to see • it; ’ and that he then attempted to apply his brakes, causing the front end of the car to bow down as testified by Nettles.
“In my opinion the only objects connected with the trailer ever picked up by the lights of the Hicks car were the jack on the right and the rear dual wheel on the left. The tires on. this wheel were black, the same color as the pavement. It is highly probable the first object seen by Hicks was the rear end of the trailer, and that he saw this not because of the lights , in. the vicinity but in spite of them. He doubtless could and would have seen the rear end of the trailer sooner if he had been approaching it from the rear with no lights whatsoever in the vicinity, even on his own vehicle.
“In view of the above conclusions it is my opinion this case falls squarely under the decisions in Gaiennie v. Cooperative Produce Co. [La.App.], 196 La. 417, 199 So. 377; Dodge v. Bituminous Casualty Corporation, 33 So.2d 95, and 214 La. 1031, 39 So.2d 720; Lynch v. Fisher [La.App.], 41 So.2d 692; Buford v. Combs [La.App.], 50 So.2d 469. In these cases exceptional circumstances'-were found which absolved the operators of the moving vehicles from the charges of contributory negligence. The facts in the instant case appear to be strikingly similar to the facts in the last cited case, Buford v. Combs.
“It is my opinion that the negligence of the operators of the parked vehicle was the proximate cause of the collision here involved.”
We find no error in the holdings of the Lower ■ Court. The record clearly shows that the defendants were guilty of negligence; that the parked vehicle presented a “death trap.” No negligence was shown on the part of the deceased. In the absence of obvious error below, we will not reverse the findings of fact by our brethren below.
The quantum awarded below is substantiated by the evidence in this proceeding. Neither the petitioner nor the defendant have found fault with the damages awarded, and they will remain as assessed below.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by defendant.
Judgment affirmed.