### John A. JAMES
### v.
### UNITED STATES of America.

**The Service Fire Insurance Company of New York, Intervenor.**

**Civil Action**

**No. 5297.**

United States District Court
W. D. Louisiana
Shreveport Division.

May 13, 1957.

See also 19 F.R.D. 229.

Whitfield Jack, Booth, Lockard, Jack & Pleasant, Shreveport, La., for plaintiff.

T. Fitzhugh Wilson, U. S. Atty., and Meredith T. Holt, Asst. U. S. Atty., Shreveport, La., for the Government.

LeRoy Smallenberger, Smallenberger, Eatman & Morgan, Shreveport, La., for intervenor.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

At about 10:30 P.M. on November 25, 1955, John A. James, a citizen of this District, crashed the front of his automobile into the right-hand side of an Army truck-trailer. He suffered rather severe injuries and money damages, for which he here sues the Government under the Federal Tort Claims Act, 28 U.S.C.A. § 2671 et seq. Jurisdiction is vested in this Court by 28 U.S.C.A. § 1346 (b).

The accident occurred during the extensive war games conducted in Louisiana during late 1955, known as Operation Sagebrush. Briefly, the facts were as follows:

A large Army truck and van-type semi-trailer operated by Private Francis L. McCoy, followed by another Army truck and flat-bed semi-trailer driven by Private Elvin D. Myer, accompanied by Private James I. Padgett, had been proceeding in convoy westerly on U. S. Highway 80 in Bienville Parish, Louisiana. They were carrying full loads of ordnance supplies for use by troops in the field. At a small town named Gibsland they were supposed to make a left turn and proceed south, but, being unfamiliar with the area, they missed the turn and had travelled about one mile west of Gibsland, to a point just east of the accident scene, before realizing their mistake.

Highway 80 at that point runs east and west. The paved portion was of asphalt construction, 24 feet in width, with flat shoulders on either side approximately 12 to 15 feet wide. The road is practically straight for several hundred yards in each direction from the point of the accident. To the west it slopes slightly down-grade for about 200 yards, is level for a short distance, and then rises gradually up a low hill, the crest of which is approximately 500 yards west of the accident situs. Parallel to the highway on the north side was a waterfilled drainage ditch, lying between the road and the east-west tracks of the Illinois Central Railroad. To the south of the road, about midway between the hill to the west and the accident scene, was a small pond about one acre in size.

At the point of impact, a small, gravelled country road, running north and south, intersects the south side of the highway at a right angle but does not cross it. East of this road and south of the highway is located an abandoned filling station building, set back about 20 feet from the south edge of the pavement and about 10 or 15 feet east of the east line of the gravelled road. About 100 feet east of this "T" intersection, another gravelled road intersects the highway from the north at a right angle, but also does not cross it.

When the soldiers realized they had missed their turn, Private McCoy stopped his truck on the north shoulder of the highway, with its front end a few feet east of the east line of the northerly intersecting road. Private Myer stopped his truck with its front approximately 6 feet to the rear of the McCoy truck. Both vehicles were completely off the pavement. McCoy, Myer and Padgett dismounted and discussed the situation. After consulting their maps, they decided they must turn around and proceed back to Gibsland in order to get on the correct road. The problem was how to effect the turn-around in safety.

At first they considered making a "U" turn using the southerly gravelled road and the apron in front of the abandoned filling station, but decided there was not enough space for this maneuver. They then concluded that the vehicles must be driven to the left into the southerly gravelled road, then backed onto the highway in a northwesterly direction, thereafter proceeding forward, turning to the left toward the southeast, circling back upon the highway to the east. Realizing that other traffic might approach the scene before such maneuvers could be completed, they undertook to handle the turn-around one vehicle at a time, with traffic guards stationed both east and west of the intersection. Accordingly, Private

Myer proceeded on foot along the highway about 150 to 200 yards to the east of the filling station, and Private Padgett dog-trotted about 60 to 100 yards to the west. Observing that no traffic was approaching from either direction, they whistled to Private McCoy, who drove his truck forward and turned left into the southerly road, proceeding far enough south so that the rear of the van-trailer reached a point a few feet south of the south edge of the pavement. Since the over-all length of the truck-trailer was 35 feet, this meant that in this position its front end and headlights were approximately 40 feet south of the pavement. While the vehicle was stopped at that point, Private Myer observed a westbound automobile approaching, which he stopped at the point where he was stationed by flagging with his arms. This car remained in that position with its headlights burning, the lights of the Myer truck also having been left burning, until the accident occurred.

Meantime, observing that there was no traffic in sight approaching from the west, Private Padgett signalled to McCoy by whistling that the way was clear, whereupon within a few seconds McCoy shifted into his lowest reverse gear and, looking out the left hand door to his rear, he proceeded to back upon the highway very slowly.

All lights on the McCoy vehicle, except its blackout lights, were burning. In addition to the headlights, which were shining in a southerly direction, there were located along the right-hand side of the van-trailer—which was the aspect presented to eastbound traffic—the following lights and reflectors: At the right rear corner of the van, approximately 10½ feet above ground level, was a red clearance light, approximately 4 inches wide; at the right front corner of the van was an amber clearance light, of the same size and the same distance above the ground; at the lower right front and rear of the right side of the van, approximately 5 feet above ground level, were two round, 3-inch glass re-flectors, two others of the same size being located, respectively, on the trailer about 4 feet above the ground immediately above the right rear drive-wheels, and about 3 feet from the ground on the right rear side of the tractor just ahead of the front drive-wheels, which were of the tandem type. These lights and reflectors were clean and clear of dust or dirt, the vehicle having been washed that morning. Both the truck and trailer were of regulation olive drab color. The weather was chilly, clear and dry.

Meanwhile, plaintiff, who worked at a refinery located on Highway 80 some distance west of the accident scene, had completed his tour of duty at about 10 P.M. Shortly thereafter he entered his car, drove to the highway, and proceeded upon it in an easterly direction toward his home. He testified he was driving at about 35 to 45 miles per hour, and that he continued at this speed until the accident occurred.

He sustained a brain concussion in the impact, which produced a retrograde amnesia. The last event he remembers prior to the accident was his passing the crest of the hill some 500 yards west of the accident scene. There he observed a small patch of fog, evidently coming from the pond south of the highway and the ditch to its north, which he said was not heavy and was floating high enough above the roadway so that he could see ahead under it, without obstruction to his forward view. He does not remember seeing Private Padgett, who was standing in the middle of the eastbound traffic lane, some 60 to 100 yards west of the McCoy truck, waving a light colored map about 12 inches square and shouting "Stop!" as plaintiff passed in an effort to halt him. He does not recall seeing the McCoy vehicle, or any of its lights or reflectors, before he crashed into its side at a point just behind its right rear tandem drive-wheels, at which time the rear end of the van-trailer, moving slowly backward, had reached a point several feet north of the highway center line; nor does he recollect seeing the lights of

the Myer truck, parked on the north shoulder about 150 feet to the east, or the car Myer had stopped in the westbound traffic lane some 150 to 200 yards away. He likewise does not remember whether he applied his brakes, or slowed his car, at any time before striking the truck. In short, plaintiff does not know whether he maintained a careful and proper lookout, or whether he kept his car under adequate control under the circumstances—a complete "blackout" of memory as to the critical moments preceding the collision. The only other eyewitnesses were the three soldiers.

■ Taking into account the undisputed physical facts, and having considered the testimony of all the witnesses— particularly the soldiers, who impressed us with their honesty and sincerity—we have arrived at the conclusion that plaintiff legally is not entitled to recovery of damages in this suit.

In his complaint, and in the brief filed by his able counsel, he makes many charges of negligence against the soldiers, especially as to their failure to use flares to warn oncoming traffic. We find it unnecessary, however, to discuss, or even consider, those contentions because we think it is so abundantly plain, on this record, that plaintiff was guilty of gross contributory negligence, as a matter of law, proximately causing the accident and legally barring his claims for damages. He failed to maintain a proper lookout, and to keep his car under proper control, so as to have stopped in time to avoid the collision.

■ It is elementary, of course, that under Louisiana law the slightest contributory negligence which is a proximate cause of an accident is sufficient to bar recovery of damages by a plaintiff who is guilty of it. This proposition is so well settled as to require no citation of authority.

■■ The Rules of the Road in this State, established by the statutes and jurisprudence, make it clear that at all times all drivers must operate their vehicles under careful and prudent control, maintaining a proper lookout ahead, and at night or under adverse weather conditions they must be able to stop within the distance they actually can see. Their headlights must extend, under normal conditions, not less than 200 feet ahead. A motorist who runs into an object blocking the highway is presumed to be guilty of negligence unless he can show that there was something unusual in the situation, which could not have been observed or anticipated by the average, reasonably prudent man. Louisiana Power & Light Co. v. Saia, 188 La. 358, 177 So. 238; Goodwin v. Theriot, La.App., 165 So. 342; Geoghegan v. Greyhound Corporation, 226 La. 405, 76 So.2d 412; King v. Risdon, La.App., 76 So.2d 548; McCann v. Dixon, La.App., 50 So.2d 107; Capitol Transport Co., Inc., v. A. R. Blossman, Inc., 218 La. 1086, 51 So.2d 795; Finley v. Guidroz, La.App., 58 So. 2d 271; Piland v. Maryland Casualty Co., D.C.E.D.La., 85 F.Supp. 31, affirmed 5 Cir., 179 F.2d 678; Wing v. A. R. Blossman, Inc., La.App., 79 So.2d 133.

Only under exceptional circumstances, where the motorist is presented with a sudden emergency, which he did not create or contribute to and which he could not anticipate, is he excused from these requirements. Gaiennie v. Co-operative Produce Company, 196 La. 417, 199 So. 377; New Amsterdam Casualty Company v. Ledoux, 5 Cir., 1947, 159 F.2d 905; Vowell v. Manufacturers Casualty Insurance Co., 229 La. 798, 86 So.2d 909; Dodge v. Bituminous Casualty Corp., 214 La. 1031, 39 So.2d 720; Atkins v. Halliburton Oil Well Cementing Co., 5 Cir., 196 F.2d 876; Buford v. Combs, La.App., 50 So.2d 469. No such extraordinary conditions were shown to have existed here.

As plaintiff approached the scene, driving at approximately 45 to 50 miles per hour, even if his headlights did not pick up the Army truck slowly backing across the highway, he clearly should have observed its red and amber clear-

ance lights, plainly showing the movement of the vehicle across his pathway. The photographs in evidence show that on a clear night such as this he could have seen the lights on this vehicle from a distance of more than 300 yards, even if it was stopped and had not started moving backward when he was that far away. When it began to move, it should have been plainly visible, because in addition to its lights and reflectors, the lights of the Myer truck, and of the car stopped by Myer upon the highway, were illuminating the scene and must have silhouetted the large van-trailer to his view, had he been maintaining a proper lookout. If he was partly or wholly blinded by these lights, it was his duty to slow down so as to be able to stop within the distance he actually could see, or to stop altogether, if necessary.

He admitted on the witness stand that he knew extensive Army maneuvers were going on in the area and that Army traffic might be expected at any time and any place. Yet he apparently paid no attention whatever to Private Padgett, who was standing in the middle of plaintiff's lane of traffic, at a safe distance from the McCoy truck, dressed in Army fatigues, waving and shouting in an effort to stop him. Padgett even had to jump out of plaintiff's way in order to avoid being struck by the car. The driver of the car stopped by Private Myer, and the driver of another car proceeding east immediately after the accident, who was stopped by Padgett, had no trouble seeing them and observing their warnings, even though these soldiers had no lights or flares. Why plaintiff didn't observe them no one knows. Under these circumstances, plaintiff has only himself to blame for his injuries and damages. This has been shown, not only by a clear preponderance of the evidence, but to the extent of absolute conclusiveness.

While we hold the greatest sympathy for plaintiff, we cannot allow our "heart" to overrule our "head". His claims must be rejected.

Present judgment for signature.