ELLIS, Judge.
Plaintiffs have appealed from a judgment dismissing their suit for personal injuries and property damage as a result of an accident that occurred on Thursday, January 17, 1957, approximately five miles east of the city of Eunice, Louisiana, on U. S. Highway 190, around 11:45 P.M. Ernest Myers had been sent by his employer, Jackson Ford Motor Company, Inc., of Sulphur, Louisiana, to pick up a new 1957 Ford station wagon which was to be delivered to a customer of the Jackson Ford Motor Company, Inc. When Myers was about 5 miles east of Eunice, La., he ran into the rear portion or end of a Plymouth automobile owned by Taunice Vidrine, and which had been driven by his minor son, Roger J. Vidrine, to the Green Lantern Club in Lawtell, Louisiana, along with a young lady who, at the time of the trial, had become his wife, and his two sisters, where they had attended a dance. Young Vidrine and his guest passengers left the club around 11:30 to return to their home, and were driving on U. S. 190 in a westerly direction at approximately 50 to 55 miles per hour when the rear end of their automobile was struck by a 1956 Ford being driven by defendant, Palmer Warner Grim, who at the time was in the employ of the American Chain & Cable Company, also made defendant herein, as well as its insurer, the American Mutual Liability Company. As a result of the rear end collision the 1956 Ford driven by Grim continued off of the highway, went through a canal, through a fence and turned over with its four wheels up in the air in a pasture on the south side of the highway. The Vidrine automobile was knocked around in a counter clockwise movement and came to rest with its front end facing in a northeasterly direction and its rear end in a southwesterly direction. The evidence and diagrams as to its position show that its right front wheel was closer to the center line than its right rear wheel which was some four or five feet from the center line, which would place the automobile in a crosswise position with most of it in the north, or westbound, lane of traffic and the rear portion protruding into the east or southbound lane of traffic, in which the plaintiff Ernest Myers was traveling from Eunice toward Opelousas, at the time that he struck the rear protruding portion in his lane of travel.
The preponderance of the evidence is convincing that Grim was intoxicated. The state trooper testified that he considered him so and that he smelled very strongly of alcohol. Grim contends that he had had a few drinks with friends around Baton Rouge before leaving on his way to Houston and had stopped only for coffee outside of Opelousas when he became drowsy, and that he was not in anywise intoxicated but only sleepy and possibly had dozed or drowsed just prior to, or at the time of, the collision. In either event he is guilty of the grossest kind of negligence.
Immediately after the Grim car had struck the Vidrine automobile young Vid-rine and his guest passengers got out of the *272 automobile and went to the south side of the road where young Vidrine flagged down two cars and one truck. He had no light hut managed to attract their attention by waving his arms standing close to the highway. He asked the occupants of the car to notify the law, which they evidently did as the State Trooper arrived on the scene at 11:58. The transport truck which he flagged down proceeded on down the highway approximately 300 feet and was pulling off to park at the time that the second collision occurred. The truck driver was going to get out flares and put them behind the Vidrine car on both sides in order to protect any traffic that might come along before the car could be moved. We do not find from the record any negligence on the part of young Vidrine as it was not shown that he could possibly have moved his car. The front lights were still burning but shining across the other lane of travel from that in which Myers was approaching. The tail lights were out. There is no evidence that there was any kind of light to the rear or on the rear part of the Vidrine automobile. It is definitely proven that the Vidrine automobile was stopped with a portion of its unlighted rear end protruding into the lane of travel on the south side of U. S. Highway 190. Also it is shown by the record that a very short time elapsed between the first collision and the second, although it is definitely established that it was not simultaneous.
It is argued that the negligence of Grim cannot be classified as a concurrent cause because the injury to the plaintiffs could not have happened from his negligence and the negligence of the Vidrine vehicle after they had come to rest. Counsel for defendant, American Chain & Cable Company, Inc., Grim, and the American Mutual Liability Company, cited and quoted the rule as laid down in the case of Kern v. Bumpas, La.App., 102 So.2d 263, 265, viz.:
“Our jurisprudence requires of the complainant that he demonstrate that the act of negligence charged be the proximate cause of the injury. This condition is met by establishing a causal connection by a natural and unbroken sequence without intervening efficient causes between the negligence and the injury, and if, in the sequence of events between the original negligence and the injury, an entirely independent cause intervenes and is itself sufficient to stand as the cause of the accident, the second cause is the ‘proximate cause’, and the other the ‘remote cause’, of the accident.”
However, we agree fully with the counter argument of counsel for plaintiffs as set forth in his brief and we quote:
“Thus, under the circumstances of this case, regardless of which version we accept with reference to the condition of Palmer Warner Grim, it was certainly willful misconduct and gross inexcusable negligence to proceed down the highway at such a speed to overtake a moving vehicle, when he did not and could not have had full control of all of his faculties. As a result of this gross and inexcusable negligence, Palmer Warner Grim brought about a situation which contributed to and proximately caused the whole series of events which immediately followed. In this connection, counsel for American Chain & Cable Company, American Mutual Liability Insurance Company and Palmer Warner Grim will in all probability attempt to argue that there was an intervening cause between the impact of the Grim vehicle and the impact of the Myers vehicle. In such a situation this Court expressed in Chavers v. A. K. Blossman [Inc., La.App.], 45 So.2d 398, 402, as follows:
“ ‘That is not the law in this state. The law of this state is well set forth in the case of Lynch v. Fisher, La.App., 34 So.2d 513, 518, and from which we quote the following:
“ ‘ “We think it is well established that the general doctrine of foreseeability is not applicable to the extent of relieving one who sets in motion, through the agency of the negligent act, a chain of circum *273 stances leading to the final resultant injury. In Payne v. Georgetown Lumber Co., Ltd., 117 La. 983, 42 So. 475, 477, the Court said: ‘That the particular injurious consequence was “improbable” or “not to be reasonably expected” is no defense. Wharton, Law of Negligence, (2d Ed.) Section 77. The same writer says:
“ ‘ “The fact is, that the consequences of negligence are almost invariably surprises. A man may be negligent in a particular matter a thousand times without mischief; yet, though the chance of mischief is only one in a thousand, we would continue to hold that the mischief, when it occurs, is imputable to the negligence.” ’
“Thus we are faced with the proposition that a negligent act, being gross and inexcusable, set into operation a chain of events which resulted in injuries not only to the Vidrine vehicle but eventually to the Myers vehicle and to Myers himself. While there is some question as to whether there was an intervening time in which Roger J. Vidrine could have extricated himself and his vehicle from this situation, it is not the position of the plaintiffs that Roger J. Vidrine did have sufficient time, due to the close sequence and almost simultaneous occurrence of events. It is to be noted that Roger J. Vidrine, with his company, departed from the Green Lantern at approximately 11:30 P.M., made a short detour and thence headed toward Eunice, and that the accident occurred at approximately 11:45 P.M. Trooper Ferris testified that he received notice of the accident at 11:56 P.M. and was at the scene of the accident at 11:58 P.M. Considering the short time element, together with the fact that the Vidrine vehicle would not run and the fact that, as Roger J. Vidrine admitted, there was a great deal of excitement, there was no time for calm deliberation or action on his part and no time whatsoever to remove the vehicle from the center of the highway if in fact it would have run.”
Therefore, unless Ernest Myers, plaintiff, was guilty of contributory negligence the gross negligence of Grim was the sole proximate cause of the second collision.
Under the general rule plaintiff would be guilty of contributory negligence as he was not able to stop within the range of his headlights, Geoghegan v. Greyhound Corporation, 226 La. 405, 76 So.2d 412; Louisiana Power and Light Company v. Saia, 188 La. 358, 177 So. 238; Cooper v. Boudreaux, La.App. First Circuit, 80 So.2d 873, unless this case falls under the exception to this doctrine, where an oncoming motorist’s failure to perceive stationary motor vehicle in its path is excusable when the object is difficult to see or not reasonably to be anticipated due to some event, occurrence, or fact that obstructed his vision, detracted his attention, or prevented his seeing the object on the highway. Gaiennie v. Cooperative Produce Co., 196 La. 417, 199 So. 377; Gautreaux v. Orgeron, La.App., 1 Cir., 84 So.2d 632; Achord v. Great American Indemnity Co., La.App., 1 Cir., 68 So.2d 643; Buford v. Combs, La.App., 1 Cir., 50 So.2d 469; Suire v. Winters, 233 La. 585, 97 So.2d 404; Vowell v. Manufacturers Cas. Ins. Company, 229 La. 798, 86 So.2d 909; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1; Le Blanc v. Southern Farm Bureau Casualty Ins. Co., La.App., 104 So.2d 279. In the Suire case the Supreme Court of Louisiana restated the general rule in determining whether a motorist is contributorily negligent as follows [233 La. 585, 97 So.2d 406]:
“In determining whether the plaintiff was contributorily negligent in failing to observe a stationary vehicle obstructing the highway ahead, no hard and fast rule can be laid down, but the surrounding circumstances and facts bearing on this particular case necessarily must be considered. The duty to use reasonable care for the safety of others places the operator of the motor vehicle under continuing duty to keep the proper lookout for other vehicles which may be properly parked along the road as required by statute or dictated prudence. However, although it is the duty of a motorist to have his car under such control that he can bring his *274 vehicle to a stop within his range of vision, the standard the law gives us to apply is that to be exercised by reasonably prudent motorists under a given set of facts and circumstances then prevailing and not that exercised by imaginary ideal motorists.”
The facts are not seriously in dispute and the only difficulty arises as to the interpretation to be placed upon the facts, and finally, the conclusion which will lead us to a proper decision. There is no doubt but that the Vidrine car as a result of Grim’s inexcusable negligence came to rest with a portion of its rear end with no tail lights burning, in plaintiff’s lane of travel. It is also true that the headlights were still burning on the Vidrine car but the front end of the car was in the opposite lane of travel and were shining or illuminating the paved portion of the highway in the opposite lane of travel and presumably a portion of the shoulder and beyond the limits of the road. It is also true that young Vidrine succeeded in waving down with his hand two cars which proceeded on after stopping, and a large truck which was properly lit with tail lights and which after stopping proceeded on east some 300 feet in order to1 park off of the highway and the driver intended to bring flares and warning signals to place around the Vidrine vehicle. It is argued that the operators or drivers of the two cars and the large motor transport truck saw the Vidrine vehicle and stopped and, therefore, plaintiff should have seen it. There is no evidence in this record, because none of these witnesses could be located, or were produced, that the drivers of the two cars, or the truck, stopped because they saw the Vidrine automobile prior to, or at the time they saw young Vidrine waving them down. From the testimony it is more likely to believe that they stopped because they saw young Vidrine flagging them. It would have certainly been of great assistance to the court if these witnesses could have given their testimony, and, likewise, it would be of great assistance if the plaintiff had not received a severe blow about the face and head which rendered him semi-conscious and he remembered nothing except immediately prior to the collision seeing what he described or thought was a car coming in front of him, and which in fact was the Vidrine car partially blocking his lane of travel. He didn’t remember seeing young Vidrine, who testified he tried to wave him down, although he did apply his brakes immediately before the collision. Young Vi-drine and the passengers in his car who testified estimated his speed at a very excessive rate, however the facts show that plaintiff was traveling in a careful, ordinary and prudent manner as far as speed was concerned. His car practically stopped at the point of collision. The Vidrine car was propelled or knocked around the distance across the north lane of travel, which was 12 feet, and slightly to the east of where its front end turned just prior to the time the plaintiff struck its rear protruding portion. It is true that there were no approaching automobiles to blind the plaintiff and the night was clear, however, he was traveling at a reasonable rate of speed and he was faced with the Vidrine car with its rear portion protruding into his lane of travel, and in front of him in his own lane of travel was the large transport truck with its red tail lights burning, which was the only obstacle, or automobile, he could see with tail lights traveling in his lane. This was the only obstacle that he could see as he approached the scene of the first collision. Plaintiff does not remember seeing this truck nor does he remember seeing young Vidrine who attempted to flag him or wave him down, however, this is in keeping with medical testimony which this court has had in other cases where parties have been rendered unconscious by a blow on or about the head. It is not uncommon for them to suffer a complete loss of memory, however, the plaintiff does remember seeing the Vidrine car and applying his brakes, but too late to avoid the collision. Counsel for plaintiff point out also that it is most probable that plaintiff did see young Vidrine and that his attention was focused away from the Vidrine automobile which partially blocked his lane. If plain *275 tiff saw young Vidrine he evidently did not intend to stop, which is not out of the ordinary, as many people refuse to stop under such circumstances, believing that the party flagging them is a hitchhiker. On the other hand, if plaintiff did not see young Vidrine he would still have no reason to believe or anticipate that there had been a wreck and that his lane of travel was partially blocked by the rear portion of the Vidrine car protruding into his lane of travel for he could see the transport truck immediately preceding him and there is no testimony that it did anything out of the ordinary when it stopped at young Vidrine’s signal or when it passed the wrecked car which would serve as a warning to a following motorist.
We believe that the position of the Vidrine car, the total absence of any tail lights, the fact that the plaintiff was traveling at a prudent and reasonable rate of speed, and the total absence of anything that would warn him that such a condition existed, other than young Vidrine waving for him to stop, which we have mentioned would have drawn his attention away from the wrecked automobile, and the unconscious sense of security which would be given to any motorist who saw immediately preceding him the tail lights of another motor vehicle, and only that, in his lane of travel, without having seen any unusual movement of the preceding motor vehicle which might serve as a warning of the dangerous situation in his lane of travel, brings this case into the exception to the general rule and relieves plaintiffs of any contributory negligence barring their recovery.
This brings us to the question of quantum. The Jackson Ford Motor Co., Inc., proved its damages for the loss of the Ford Station wagon after salvage to be $729.07. In addition there was expense of $40, telephone calls and replacing the wrecked vehicle and gasoline used to do so, together with $25 wrecker charges to the Diesi Wrecker Service, or a total of $1,194.07.
Plaintiff Myers, as a result of the accident, was in a semi- or unconscious condition after the accident for a period of approximately two hours, received emergency treatment in Eunice, La. He received a laceration and injury to his right knee, general contusions of the chest and body, a laceration of the mouth which is described by the doctor as having torn his tongue loose from the floor of the mouth, which probably occurred when his false teeth were broken up, and a disputed hernia which will be discussed later, and also an alleged severe aggravation to an existing arthritic condition. On January 18th, which was the day following the accident, he was seen and treated by Dr. Jackson of Clinton, Louisiana. This doctor stated that at the time he saw him his knee had already been sutured, which was done in Eunice. He was treated for approximately two months by this doctor, the last visit being on March 11th at which time he was complaining of pain in the back and neck and Dr. Jackson sent him to Dr. McMains who specialized in orthopedic surgery in the city of Baton Rouge, Louisiana. Myers did not tell Dr. Jackson of any pain in the right groin region, however, when he visited Dr. McMains he gave a history of lacerations of his tongue, around his knee and pain in his neck and low back, right rib cage, and in the right groin region. He stated that the pain in the right groin region had first been felt by him when he awoke in the hospital in Eunice, Louisiana, after the accident. Myers denied any previous trouble with his neck or low back region prior to the time of the accident. Dr. McMains’ examination was stated in his testimony as follows:
“ * * * Examination of the lumbar spine revealed a complete loss of normal lordotic curve. Tenderness was well localized at the lumbosacral junction. Straight leg raising was not restricted, there was no evidence of any atrophy of the thighs or calves by mensuration. Knee and ankle jerks were equal and physiological. There was limitation of lumbar spine motion as far as forward flexion and right left lateral bends go as well as discomfort on extremes of hyperextension. Examination of his *276 cervical spine revealed tenderness well localized over the C-6, C-7 area with restriction of left lateral rotation and left lateral bend. The extremes of flexion were uncomfortable. Hyperextension was not particularly limited nor was it uncomfortable. Evaluation of the muscle strength through both upper extremities was good. There was no evidence of any muscle weakness. There was no abnormality in the tendon reflexes. The patient had a definite dilatation ■of the right inguinal ring and I felt the possibility of hernia should be considered and I referred the patient to Dr. A. K. Mclnnis and follow up from that viewpoint. Regarding his orthopedic problems, I felt that the patient was in need of therapy and prescribed on that occasion an external support, salicylate therapy, restriction of activity and then the patient was seen by Dr. Mclnnis and hospitalized for his hernia. The patient was not seen again by me except on one or two occasions when he was in the hospital until the 29th of May of this year. At this time he returned at my request in that I wished to reevaluate him for this period today. His history remained much the same he bent over for any short period of time he had very severe pain in his low back region and more specifically he had difficulty and disability with his neck for instance in attempting to back a car, he could not turn his neck to see behind him. He had to rotate his entire body in order to be able to do this satisfactorily. He has also had some right shoulder pain and when last seen he described this pain as more or less .constant and the patient gave a history also of having to sleep with just a small roll under his neck rather than using a pillow be .cause of discomfort. Examination of his ■cervical spine revealed a tenderness in the lower cervical spine region again, C-S, C-6, ■C-7 region. There was definite limitations of left lateral bend and left lateral rotation. There was tenderness along the right lateral .cervical muscle mass. The rotation was ■more limited on this occasion than it was ■when he had been seen approximately a year before. Flexion and extension were .also restricted and he did not have as great a range of motion as he had the year previously and he also complained of discomfort. Again there was no evidence of any muscle atrophy in the upper extremities or any abnormalities in his tendon reflexes. His low back examination was essentially that which had been seen the year previously. Again the patient was referred to Drs. Robert and Geheber in Baton Rouge for repeat x-rays of his cervical spine. These films showed no significant changes during the yearly interval. However, in general there was hypertrophic arthritic changes particularly at the fifth and sixth vertebra with some narrowing of the intervertebral space. There was also generalized osteoarthritis of the lumbar spine area and it was my impression and opinion on this gentleman that he had a moderately advanced osteo-arthritis of his cervical spine and of his lumbar spine, within view of his history of complete lack of symptoms prior to the time of the accident was probably aggravated by the accident.”
Dr. McMains thought the neck injury was the result of trauma superimposed upon a preexisting osteo-arthritis, which constituted definite aggravation and not a whiplash injury. He also felt that his findings would substantiate plaintiff’s pain.
As a result of Dr. McMains’ examination he was sent to Dr. A. K. Mclnnis, Jr., who specialized in general surgery. Dr. Mclnnis stated that as a result of Dr. McMains’ examination he had diagnosed a right inguinal hernia which he wanted checked. Plaintiff stated to Dr. Mclnnis that he had experienced an aching, burning sensation in his right groin since his auto accident, and that it was aggravated by walking, coughing or crossing his legs, and that he had never before had such a complaint and denied any knowledge of having had a hernia before his accident. Dr. Mclnnis confirmed Dr. McMains’ diagnosis of a right direct inguinal hernia and on May 8 he operated on plaintiff. Plaintiff was discharged on the 16th of May 1957 and re-examined two weeks subsequent thereto. He returned to work on June 18, 1957, with instructions not *277 to do any heavy lifting for another month. On August 1, 1957, plaintiff again returned to Mclnnis’ office for reexamination which revealed that the hernia was still well healed and that was the last time that this doctor saw him. Dr. Mclnnis stated that assuming that what plaintiff told him was true, he very definitely could connect the hernia with the accident. The doctors who treated plaintiff thought he was sincere and found him to be a cooperative patient and had found no reason to doubt his past history with reference to his complaints.
Dr. Meacum, a dentist at East Louisiana State Hospital, testified that a charge of $250 to replace the false teeth would be a minimum. Plaintiff’s hospital and medical •bills totalled $585.14.
The only weak link in plaintiff’s testimony with regard to having received a hernia in the accident is his failure to complain or mention any pain in the region of the groin to Dr. Jackson who saw him the day after the accident and treated him for approximately two months. Dr. Jackson testified that a year and a half had passed and he was giving his testimony from memory and it was therefore possible that he could have been mistaken. However, if he was not mistaken we do not feel that this should preclude the existence of plaintiff’s hernia as the result of the accident in view of the fact that he did complain of it shortly after being treated by Dr. Jackson and his complaints were verified by Dr. McMain and by Dr. Mclnnis. We see nothing from reading plaintiff’s testimony that would lead us to believe that he had falsified any of his testimony. We are convinced that plaintiff has proven that his hernia was the result of the accident.
Counsel for plaintiff has cited the case of Kirby v. Great American Indemnity Company, La.App., 98 So.2d 277, decided by this ■court in which plaintiff suffered a hernia and disability in the lower part of his back and along both legs to such an extent that Tie suffered sufficient pain and was having ■such difficulty in getting around that it was necessary to inject morphine and oil to deaden the pain. In this case we affirmed an award of $3,000 for his personal injuries. In this case the plaintiff had not been operated upon for the repair of his hernia.
Counsel also refers us to the case of Rodriguez v. State Farm Mutual Insurance Company, La.App., 88 So.2d 432, in which an award was made to a 54 year old plaintiff who sustained very painful injuries, bruises to her hip, shoulder and chest, a broken collar bone, a right ankle sprain, right thumb tendon and hand injury, was hospitalized 10 days; spent six weeks in a cast; was unable at the date of trial, eight months after the accident due to residual stiffness and pain in the right shoulder and hand, to place her right hand behind her or raise it over her head. An orthopedic expert estimated potential disability of 10 per cent of the shoulder, not serious enough to bar her employment but possibly produce awkwardness or pain in extreme movements of the affected members. We affirmed an award of the district court for $7,500 for mental and physical pain and suffering and permanent disability. We believe, however, that plaintiff in the cited case received more serious injuries and greater pain and suffering than did plaintiff in the case at bar. It is only natural that Myers would have suffered substantial pain as the result of his hernia operation, and the pain from the hernia prior to its repair, as well as pain and suffering as the result of the general bruises and contusions about his body, the severe lacerations to his knee, and his mouth, and in addition he suffered an aggravation to an existing arthritic condition which was no better and was still paining him on the date of the trial. We believe that an award of $7,500 for plaintiff’s pain, suffering and disability would be proper.
It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled and reversed and that there now be judgment in favor of the plaintiff, Jackson Motor Co., Inc., and against the defendant, American Chain & Cable Co., Inc., *278 Palmer Warner Grim and the American Mutual Liability Company, individually, jointly and in solido, in the full sum of $1,-293.12 with legal interest thereon from date of judicial demand until paid.
It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Ernest F. Myers, and against the above named defendants, individually, jointly and in solido, in the full sum of $7,500, together with legal interest thereon from date of judicial demand until paid.
It is further ordered, adjudged and decreed that the judgment of the district court be affirmed insofar as it rejects the demand of the plaintiff as against Taunice Vidrine and State Farm Mutual Automobile Insurance Company.
It is further ordered, adjudged and decreed that the defendants pay all costs.
Reversed and judgment rendered in favor of plaintiff.